# EXHIBIT A

COURT OF APPEAL – SECOND DIST.

F I L E D

Jul 13, 2022

DANIEL P. POTTER, Clerk

Jose Zelaya          Deputy Clerk

Filed: 7/13/22

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| MARINA PACIFIC HOTEL & SUITES, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> FIREMAN'S FUND INSURANCE COMPANY, <br><br> Defendant and Respondent. | B316501 <br><br> (Los Angeles County Super. Ct. No. 20SMCV00952) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig D. Karlan, Judge. Reversed and remanded with directions.

Barnes & Thornburg, David P. Schack, Matthew B. O'Hanlon and Jonathan J. Boustani for Plaintiffs and Appellants Marina Pacific Hotel & Suites, LLC, Venice Windward, LLC, Larry's Venice, L.P. and Erwin H. Sokol.

DLA PIPER, John P. Phillips, Joseph Davison and Brett Solberg for Defendant and Respondent.

———————————

For more than two years our understanding of COVID-19, the infectious disease caused by the SARS-CoV-2 virus and its many variants, has evolved.[1] Today we think we know how it spreads, how to protect against it and how best to treat those who have it. Perhaps we do. But even so, when a pleading alleges facts sufficient to constitute a cause of action, what we think we know—beliefs not yet appropriately subject to judicial notice—has never been a proper basis for concluding, as a matter of law, those alleged facts cannot be true and, on that ground, sustaining a demurrer without leave to amend. Yet that is precisely what occurred here.

The owners of Hotel Erwin and Larry's (a restaurant adjacent to the hotel) in Venice Beach—Marina Pacific Hotel & Suites, LLC; Venice Windward, LLC; Larry's Venice, L.P.; and Erwin H. Sokol, as trustee of the Frances Sokol Trust (collectively insureds)—sued Fireman's Fund Insurance Company alleging the COVID-19 virus was present on, and had physically transformed, portions of the insured properties—"direct physical loss or damage" within the meaning of Fireman's Fund's first-party commercial property insurance policy—but Fireman's Fund refused to pay policy benefits for covered losses incurred as a result. The trial court sustained Fireman's Fund's demurrer to the insureds' first amended complaint without leave to amend and dismissed the lawsuit, ruling the COVID-19 virus cannot cause direct physical loss or damage to property for purposes of

———————————

[1]    For ease of reference we refer, as do the parties, to the "COVID-19 virus."

2

insurance coverage.  That might be the correct outcome following a trial or even a motion for summary judgment.  It was error at this nascent phase of the case.  We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.  *The Fireman's Fund (Allianz) Policy*[2]

As alleged in the operative first amended complaint, Fireman's Fund issued its commercial property insurance policy no. USC007058190 for the period July 1, 2019 to July 1, 2020 to provide coverage for Hotel Erwin and Larry's.  Marina Pacific Hotel & Suites, LLC; Venice Windward, LLC; Larry's Venice, L.P.; and Erwin H. Sokol, as trustee of the Frances Sokol Trust—plaintiffs in this litigation—were named insureds.  A copy of the policy was attached as Exhibit A to the pleading.

The policy's general property coverage provision states, "[W]e will pay for direct physical loss or damage to [the insured property] caused by or resulting from a **covered cause of loss** during the Policy Period."  The policy provided business interruption coverage (with a $22 million limit) for "the actual loss of **business income** and necessary **extra expense** you sustain due to the necessary **suspension** of your operation during the **period of restoration** arising from direct physical loss or damage to [covered] property."  The terms printed in boldface type were separately defined.  As pertinent here, "covered cause of loss" was defined as "risk of direct physical loss or damage not excluded or limited in the Coverage Form"; "business income" was defined as the net profit or loss before

---

[2]    The policy attached to the first amended complaint and cited by both the insureds and Fireman's Fund is identified as "Allianz Global Corporate & Specialty® Allianz Insurance Policy." Fireman's Fund is a member of the Allianz Group.

income taxes from the business's operations; "suspension" as "the slowdown or cessation" of operations and also meant that part or all of the premises had been rendered untenable.  "Period of restoration" meant "the period of time that begins immediately after the time of direct physical loss or damage caused by or resulting from a **covered cause of loss** to the property" and ends when the property "should be repaired, rebuilt, or replaced with reasonable speed and like kind or quality."

The policy also included "communicable disease coverage" (with a policy limit of $1 million), providing the insurer would pay "for direct physical loss or damage" to insured property "caused by or resulting from a covered **communicable disease event**," including costs necessary to repair or rebuild insured property damaged or destroyed by the **communicable disease** and to "[m]itigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor and assess the effects [of] the **communicable disease**."  In addition, business interruption coverage was provided for suspension of operations during a period of restoration, provided the suspension was "due to direct physical loss or damage to property at a location caused by or resulting from a covered **communicable disease event**."  "Communicable disease" was defined as "any disease, bacteria, or virus that may be transmitted directly or indirectly from human or animal to a human."  "Communicable disease event" was defined as "an event in which a **public health authority** has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a **communicable disease** at such location."

As one of the exclusions applicable to all coverages (property coverage, business income and extra expense coverage

4

or any extensions of coverage), the policy, under the heading "Mortality and Disease," provided the insurer would not pay for any loss, damage or expense caused directly or indirectly by, or resulting from, "[m]ortality, death by natural causes, disease, sickness, any condition of health, bacteria, or virus."

　　　　2.  *The First Amended Complaint*

　　　　The insureds filed their complaint against Fireman's Fund on July 21, 2020—four months after the COVID-19 pandemic first gripped the United States and three weeks after the end of the policy period—and the operative first amended complaint on August 31, 2021, alleging causes of action for breach of contract, tortious breach of contract, elder abuse and unfair competition. All four causes of action were based on Fireman's Fund's denial of coverage and refusal to pay (or to advance) policy benefits for losses claimed by the insureds as a result of the pandemic.

　　　　The first amended complaint alleged, in part, the insureds, beginning in March 2020, had suffered loss arising from direct physical loss or damage to covered property based on the existence of COVID-19.  They asserted that "COVID-19 is a covered cause of loss under the Policy because it is not excluded or limited thereunder" and, on information and belief, that "the presence of COVID-19 on property, including on and within Insured Properties (i.e., an external force), caused and continues to cause physical loss and/or damage to property by causing, among other things, a distinct, demonstrable or physical alteration to property" and "by transforming the physical condition of property at Insured Properties and within the covered radius," causing the properties to remain in an unsafe and hazardous condition.

Also on information and belief the insureds alleged COVID-19 spreads through three primary modes of transmission: airborne transmission (droplets of saliva or nasal discharge of an infected individual, which are released by a cough, sneeze, speech or similar modes and inhaled by others); aerosols (smaller droplets that can linger in the air for hours and reach others further away); and fomite transmission—indirect contact with surfaces or objects where the virus has been disseminated by a person with COVID-19.  The first amended complaint continued, "Both porous and nonporous surfaces or objects can harbor COVID-19 and serve as vehicles of transmission.  Once this occurs, the transfer of COVID-19 may and does readily occur between inanimate and animate objects, or vice versa.  A study by the Virology Journal showed that COVID-19 can survive on surfaces up to 28 days, serving as a vehicle for transmission during that time span."  Citing several journal articles, the insureds alleged the COVID-19 virus does not simply live on the surface of objects.  Rather, "it also actually bonds and/or adheres to such objects through physico-chemical reactions involving, *inter alia*, cells and surface proteins" and "caus[es], among other things, a distinct, demonstrable or physical alteration to property."

The insureds alleged COVID-19 had been present in and before March 2020 on a variety of physical objects in the insured properties, including furniture, countertops, walls, bedding, appliances and food and other packaged items, as well as in the air.  The presence of the virus was not due to a single episode.  Rather, "because COVID-19 is a pandemic and is statistically certain to be carried by a number of individuals who visit the Insured Properties and other properties within the covered

6

radius daily, COVID-19 is continually reintroduced to the air and surfaces of those locations."  Further, they alleged, in response to multiple employees of Hotel Erwin testing positive, "various public health authorities have ordered that Hotel Erwin be evacuated, decontaminated, or disinfected," and specifically alleged one employee had been ordered by the Los Angeles County Department of Health–Environmental Health Division to "evacuate the hotel and quarantine."

The physical loss or damage to property, the insureds alleged, required the closure or suspension of operations at Hotel Erwin and Larry's or portions of those properties at various times and caused them to incur extra expense, adopt remedial and precautionary measures "to attempt to restore and remediate the air and surfaces at the Insured Properties, dispose of property damaged by COVID-19 and limit operations at the Insured Properties."  In addition, access to the insured properties, the insureds alleged, had at times been prevented or limited by governmental orders issued "in response to the direct physical loss and/or damage caused by COVID-19 to other property within the covered radius [as defined by the policy]."

Finally, the insured alleged they gave timely notice of the loss under the policy and had performed all conditions on their part under the policy except as excused by Fireman's Fund's conduct and breaches of contract.  Fireman's Fund, despite notice, breached the policy by denying coverage and refusing to pay any policy benefits.[3]

_____

[3]    The insureds' second cause of action alleged Fireman's Fund breached the implied covenant of good faith and fair dealing contained in the policy by, among other grounds, "[w]rongfully, intentionally, unreasonably and in bad faith

3.  *Fireman's Fund's Demurrer and the Insureds' Response*

Fireman's Fund demurred to the first amended complaint on August 19, 2021.  It argued the insureds had failed to allege facts showing direct physical loss or damage to covered property, a contractual prerequisite for a valid claim to benefits under the policy.  In support Fireman's Fund explained that courts across the country had ruled the pandemic does not equate to physical loss or damage and argued loss of use alone does not constitute direct physical loss or damage.  Because various public agency orders (from Governor Newsom and the County and City of Los Angeles) permitted the insureds' properties to remain open, Fireman's Fund contended the policy's civil authority coverage

---

refus[ing] to honor its obligations under the Policy," and by "[f]raudulently misrepresent[ing] and falsely promis[ing] that it would indemnify and pay the losses incurred by Plaintiffs under the Policy for covered losses when it had no intention of doing so."

The third cause of action for financial elder abuse alleged Sokol is an "elder" as defined by Welfare and Institutions Code section 15610.27 and a "senior citizen" as defined by Civil Code section 1761, subdivision (f), and Fireman's Fund perpetrated "financial abuse" within the meaning of Welfare and Institutions Code section 15610.30 by "taking, appropriating, obtaining and/or retaining personal property in the form of benefits owing to Sokol under the Policy for a wrongful use and/or with intent to defraud."

The fourth cause of action alleged Fireman's Fund's conduct constituted unlawful business practices in violation of California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.).

was inapplicable.[4]  Finally, it argued coverage (and, thus, the insureds' claims for damages) was expressly precluded by the policy's mortality and disease exclusion.

In their opposition filed September 2, 2021 the insureds, pointing to specific allegations, argued their first amended complaint had alleged direct physical loss or damage to covered property; disputed Fireman's Fund's interpretation of the policy's civil authority coverage provision and the mortality and disease exclusion; and argued cases from California (e.g., *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [involving asbestos fibers]) and across the country have refused to dismiss similar lawsuits at the pleading stage.

    4.  *The Court's Order Sustaining the Demurrer Without Leave To Amend*

After taking the matter under submission following a hearing on September 13, 2021, the trial court issued its final ruling on October 5, 2021, sustaining without leave to amend Fireman's Fund's demurrer to each of the four causes of action in the first amended complaint.[5]  The court, relying on *MRI*

---

[4]    The policy's "civil authority coverage," which is not at issue on appeal, provided that under certain circumstances the insurer would pay for "actual loss of **business** income and necessary **extra expense**" sustained due to the "necessary **suspension**" of operations caused by actions of a civil authority.

[5]    The court denied as irrelevant Fireman's Fund's request to take judicial notice of four orders from governmental entities relating to the COVID-19 pandemic and 10 orders and filings from various state and federal trial court cases.  The court similarly denied as irrelevant the insureds' request to take judicial notice of three orders issued in cases pending in the

*Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766 (*MRI Healthcare*), held "direct physical loss or damage," necessary for there to be a "loss" triggering coverage within the meaning of policies of the type at issue here, requires some external force acting upon the insured property that causes a physical change in the condition of the property—that is, "it must have been 'damaged' within the common understanding of that term." The insureds' allegations do not satisfy that definition, the court ruled: "[W]here the property has simply been rendered unusable based on a virus, rather than an external force, the loss of use of the property in a typical manner is not a 'direct physical loss' contemplated by the insurance policy. To the contrary, the fact that the virus 'can survive on surfaces up to 28 days, serving as a vehicle for transmission during that time span' [citing to paragraph 16 of the first amended complaint], shows that any harm is temporary such that there is no need for any repairs or remediation. Instead, risk mitigation policies responsive to the existence of COVID-19, such as those in place at the Los Angeles Superior Court, i.e., regular cleaning and mandatory masks, serve to remove the virus from surfaces and minimize transmission." That the virus actually bonds or adheres to surfaces and objects,

---

Los Angeles and Orange County Superior Courts. However, on its own motion the court took judicial notice of the three studies cited by the insureds in their pleading and observed, "[N]one of the three cited studies stands for the proposition that the presence of COVID-19 causes physical property damage, i.e., that it is 'damaged' within the common understanding of that term." Neither side challenges these rulings on appeal.

as alleged, "does not mean it causes physical damage to property."

The court additionally found, quoting the mortality and disease exclusion, that the Fireman's Fund policy "contains an express virus exclusion provision." "This provision expressly excludes coverage of any direct physical loss or damage resulting from a virus; it is beyond dispute that COVID-19 is a virus."

Because the insureds could not successfully allege direct physical loss or damage to property, the court concluded, it followed that they had failed to set forth a cause of action for breach of contract. In the absence of such a breach, there could be no tortious breach of contract, financial elder abuse or unfair competition. And the insureds failed to demonstrate they could cure those deficiencies if given leave to amend.

Judgment was entered October 26, 2021. The insureds filed a timely notice of appeal.

## DISCUSSION

1. *Standard of Review*

A demurrer tests the legal sufficiency of the factual allegations in a complaint. We independently review the superior court's ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense. (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768; *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 20; accord, *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010;

*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) Indeed, "we accept as true even improbable alleged facts, and we do not concern ourselves with the plaintiff's ability to prove [the] factual allegations." (*Friends of Glendora v. City of Glendora* (2010) 182 Cal.App.4th 573, 576; accord, *Hacker v. Homeward Residential, Inc.* (2018) 26 Cal.App.5th 270, 280 ["[i]n considering the merits of a demurrer, however, 'the facts alleged in the pleading are deemed to be true, however improbable they may be'"]; *Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958 [same]; see *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 711 ["[w]e do not concern ourselves with whether the plaintiff will be able to prove the facts that he or she may allege in the complaint"].)  However, we are not required to accept the truth of the factual or legal conclusions pleaded in the complaint.  (*Mathews*, at p. 768; *Centinela Freeman*, at p. 1010; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)

We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967; *Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 848), but liberally construe the pleading with a view to substantial justice between the parties.  (Code Civ. Proc., § 452; *Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 726; see *Schifando v. City of Los Angeles*, *supra*, 31 Cal.4th at p. 1081.)  "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; accord, *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.*, *supra*, 1 Cal.5th at p. 1010.)

2.  *Governing Law:  Interpretation of Insurance Policies*

"In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation."  (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 194.)  The principles governing such an interpretation are well-established:  "Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions.  If contractual language is clear and explicit, it governs.  If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect the objectively reasonable expectations of the insured.  If these rules do not resolve an ambiguity, we may then resort to the rule that ambiguities are to be resolved against the insurer."  (*Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, 230 [cleaned up].)

"The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection."  (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321.)  As a corollary rule of interpretation, intended "[t]o further ensure that coverage conforms fully to the objectively reasonable expectations of the insured," "in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer."  (*Id.* at p. 322.)

The insureds' appeal requires analysis of the allegations in their first amended complaint primarily in terms of one insuring provision —coverage for business interruption due to "direct

physical loss or damage to" covered property[6]—and one exclusion—for "mortality and disease." We consider each provision in turn.

### 3. *The Insuring Provision: Direct Physical Loss or Damage*

Although "direct physical loss or damage" is a crucial term in a first party commercial property insurance policy, it is left undefined in commercial property policies, which define a plethora of other words and phrases. Left to other interpretive tools, Division Eight of this court in *MRI Healthcare*, *supra*, 187 Cal.App.4th 766 construed a similar, but not identical, coverage term, "accidental direct physical loss" to insured property as requiring "'an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become

---

[6]    In addition to alleging Fireman's Fund breached the policy's business income and extra expense coverage, the first amended complaint alleged Fireman's Fund breached the policy's communicable disease coverage by failing to pay for direct physical loss or damage to insured properties caused by public health authority orders that insured properties be evacuated, decontaminated or disinfected due to the COVID-19 outbreak and the policy's civil authority coverage by failing to pay for losses caused by orders prohibiting access to the insured properties as a result of direct physical loss or damage to property other than at the insured's location.

The parties do not separately address these alleged breaches in their briefs in this court, focusing instead on whether we can hold, as a matter of law, the COVID-19 virus does not cause damage to property, a ruling that would preclude all forms of coverage under the policy. Similarly, the trial court in its order sustaining Fireman's Fund's demurrer did not discuss these alternative grounds for finding a policy breach.

unsatisfactory for future use or requiring that repairs be made to make it so.'" (*Id.* at p. 779.) The *MRI Healthcare* court continued, "The word 'direct' used in conjunction with the word 'physical' indicates the change in the insured property must occur by the action of the fortuitous event triggering coverage. In this sense, 'direct' means '"[w]ithout intervening persons, conditions, or agencies; immediate." [Citation.]' [Citation.] For loss to be covered, there must be a 'distinct, demonstrable, physical alteration' of the property." (*Ibid.*)[7]

The insureds argue *MRI Healthcare*'s definition of "direct physical loss" misstated California law and was based, they contend, solely on the erroneous assertion in a treatise of a

---

[7]    The insured in *MRI Healthcare* operated an imaging center in a building leased from a third party. As a result of storms the landlord was required to repair the roof over the room housing the MRI machine. These repairs could not be undertaken unless the machine was "ramped down" (demagnetized). Once the machine was ramped down, it failed to ramp back up. The insured alleged this failure constituted damage to the MRI machine within the meaning of its commercial property insurance. Because the damage was proximately caused by the storms, which were a covered event, the insured claimed it was entitled to recover both the amount it expended to repair the MRI machine and the income loss sustained while the machine was inoperable. (*MRI Healthcare*, *supra*, 187 Cal.App.4th at p. 770.) Affirming the judgment entered after the trial court granted State Farm's motion for summary judgment—not an order sustaining a demurrer—the court of appeal held, "The failure of the MRI machine to satisfactorily 'ramp up' emanated from the inherent nature of the machine itself rather than actual physical 'damage.'" (*Id.* at p. 780.)

"widely held" rule that was, in fact, not at all widely held.[8]  In support of this position the insureds cite *Hughes v. Potomac Ins. Co.* (1962) 199 Cal.App.2d 239, disapproved on another ground in *Sabella v. Wisler* (1963) 59 Cal.2d 21, 34, in which the court of appeal held a home had suffered physical loss or damage when the land underlying the home slid away, leaving the home standing on the edge of a newly formed cliff (*Hughes*, at p. 243),[9] as well as a third-party commercial general liability (CGL) case in which the court held the existence of asbestos fibers on surfaces in a building constituted property damage.  (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.*, *supra*, 45 Cal.App.4th at p. 90.)

Notwithstanding those authorities, the requirement an insured allege an external force acted on the insured property causing a physical change in the condition of the property to come within the coverage provision for "direct physical loss or damage" has been adopted by a number of other courts of appeal, including

---

[8]    In holding physical alteration was a necessary element of "accidental direct physical loss," the court in *MRI Healthcare* quoted extensively from the third edition of Couch on Insurance (1995).  (See, e.g., *MRI Healthcare*, *supra*, 187 Cal.App.4th at pp. 778-779.)

[9]    In rejecting the insurer's argument coverage did not exist, the *Hughes* court explained, "Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected.  Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner."  (*Hughes v. Potomac Ins. Co.*, *supra*, 199 Cal.App.2d at pp. 248-249.)

our colleagues in Division Four of this court and Division One of the Fourth Appellate District when deciding cases involving COVID-19.  (See *United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821, 830 (*United Talent*); *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688, 706 (*Inns-by-the-Sea*); see also *Doyle v. Fireman's Fund Ins. Co.* (2018) 21 Cal.App.5th 33, 38 ["""[t]he requirement that the loss be 'physical,' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer where the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property"""].)  Because we conclude the insureds' first amended complaint adequately alleged direct physical loss or damage to their covered property within the *MRI Healthcare* definition, we need not address their additional argument that *MRI Healthcare* should not be followed and direct physical loss or damage may be shown without evidence of a physical alteration in the insured property.

4. *The Insureds Adequately Alleged Direct Physical Loss or Damage Caused by the COVID-19 Virus and a Cause of Action for Breach of Contract by Fireman's Fund*

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)  Fireman's Fund's demurrer did not challenge elements (1), (2) or (4), contending only it did not breach its obligation to pay benefits under the policy because the insureds, having failed to allege any direct

physical loss or damage to property, failed to allege a covered loss.[10]

To reiterate, with respect to covered loss, the insureds alleged in their first amended complaint COVID-19 (that is, the SARS-CoV-2 virus that causes the disease) not only lives on surfaces but also bonds to surfaces through physicochemical reactions involving cells and surface proteins, which transform the physical condition of the property. The virus was present on surfaces throughout the insured properties, including the hotel lobby, kitchens at both the hotel and restaurant, employee breakroom, service elevator and parking garage, as well as on the properties' food, bedding, fixtures, tables, chairs and countertops. Because of the nature of the pandemic, the virus was continually reintroduced to surfaces at those locations. As a direct result, the insureds were required to close or suspend operations in whole or in part at various times and incurred extra expense as they adopted measures to restore and remediate the air and surfaces at the insured properties. The insureds specifically alleged they were required to "dispose of property damaged by COVID-19 and limit operations at the Insured Properties."

Assuming, as we must, the truth of those allegations, even if improbable, absent judicially noticed facts irrefutably contradicting them, the insureds have unquestionably pleaded direct physical loss or damage to covered property within the definition articulated in *MRI Healthcare*—a distinct, demonstrable, physical alteration of the property (*MRI Healthcare, supra*, 187 Cal.App.4th at p. 779). They also

_____

[10]    The parties agree, as did the trial court, for purposes of Fireman's Fund's demurrer the insureds' other three causes of action stand or fall with their ability to allege a covered loss.

18

adequately alleged that physical loss or damage caused a slowdown in, or cessation of, the operation of the insureds' business while the covered property was restored or remediated, thereby triggering their business interruption ("business income and extra expense") coverage.

We recognize this conclusion is at odds with almost all (but not all) decisions considering whether business losses from the pandemic are covered by the business owners' first person commercial property insurance. Of course, federal cases, whether considering insurance coverage under California law or that of other states; state court decisions from other jurisdictions; and decisions from other California courts of appeal are not binding on us. (See, e.g., *T.H. v. Novartis Pharmaceuticals Corp.*, *supra*, 4 Cal.5th at p. 175 ["[a]lthough the decisions of our sister states and the lower federal courts may be instructive to the extent we find their analysis persuasive, they are neither binding nor controlling on matters of state law"]; *Rubin v. Ross* (2021) 65 Cal.App.5th 153, 163 ["decisions of lower federal courts are not binding on us, even on questions of federal law"]; *Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1193 ["there is no horizontal stare decisis in the California Court[s] of Appeal"].) Moreover, virtually all those decisions dismissing lawsuits claiming coverage for business losses attributable to COVID-19 are readily distinguishable from the issue presented by the case at bar.

First, the pleading rules in federal court are significantly different from those we apply when evaluating a trial court order sustaining a demurrer. In *Ashcroft v. Iqbal* (2009) 556 U.S. 662 the Supreme Court held, to survive a motion to dismiss under the Federal Rules of Civil Procedure, "a complaint must contain

19

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (*Id.* at p. 678; see *id.* at p. 679 ["[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. [Citation.] Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"].) Unlike in federal court, the plausibility of the insureds' allegations has no role in deciding a demurrer under governing state law standards, which, as discussed, require us to deem as true, "however improbable," facts alleged in a pleading—specifically here, that the COVID-19 virus alters ordinary physical surfaces transforming them into fomites through physicochemical processes, making them dangerous and unusable for their intended purposes unless decontaminated.[11]

Second, a number of the cases rejecting COVID-19 claims, including *Inns-by-the-Sea*, *supra*, 71 Cal.App.5th 688, the first published California court of appeal decision involving a COVID-19 insurance claim, and *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753 (*Musso & Frank*), the first such decision in the Second District, involved

---

[11]     Being the careful lawyers they are, two weeks after filing their demurrer counsel for Fireman's Fund moved for summary judgment, arguing, based on discovery conducted to date, the undisputed facts established the absence of any covered losses. (We augment the record on our own motion pursuant to California Rules of Court, rule 8.155(a)(1)(A) to include Fireman's Fund's September 3, 2021 motion for summary judgment and separate statement in support of the motion.) As part of its ruling sustaining the demurrer, the trial court vacated the hearing date scheduled for that motion.

allegations of loss of use of insured property as a result of government-ordered closures to limit the spread of COVID-19, rather than, as expressly alleged here, a claim the presence of the virus on the insured premises caused physical damage to covered property, which in turn led to business losses.  (See, e.g., *Inns-by-the-Sea*, at pp. 703 ["Inns alleges that it ceased operations 'as a direct and proximate result of the Closure Orders.'  It does not make the proximate cause allegation based on the particular presence of the virus on its premises"];[12] *Musso & Frank*, at pp. 758-759 [citing *Inns-by-the-Sea* and holding a policy requiring physical loss or damage to property did not cover losses incurred as a result of the Los Angeles Mayor's pandemic-related order mandating that restaurants close by midnight]; see also *Mudpie, Inc. v. Travelers Cas. Ins. Co.* (9th Cir. 2021) 15 F.4th 885, 892 (*Mudpie*) ["Mudpie's complaint does not identify a 'distinct, demonstrable, physical alteration of the property'. . . .  Mudpie alleges the Stay at Home Orders temporarily prevented Mudpie from operating its store as it intended, and urges us to interpret

---

[12]    The court of appeal in *Inns-by-the-Sea* acknowledged, "in a hypothetical scenario," "an invisible airborne agent [c]ould cause a policyholder to suspend operations because of direct physical damage to property. . . .  'For example, a restaurant might need to close for a week if someone in its kitchen tested positive for COVID-19, requiring the entire facility to be thoroughly sanitized and remain empty for a period.'"  (*Inns-by-the-Sea, supra,* 71 Cal.App.5th at pp. 704-705.)  The court emphasized, however, that was not the scenario it was considering:  "[T]he complaint here simply does not describe such a circumstance because it bases its allegations on the situation created by the Orders, which were not directed at a particular business establishment due to the presence of COVID-19 on that specific business's premises."  (*Id.* at p. 704.)

'direct physical loss of or damage to' to be synonymous with 'loss of use'"].)

Not distinguishable on this ground, however, is *United Talent, supra*, 77 Cal.App.5th 821, Division Four's recent decision affirming a dismissal following an order sustaining a demurrer without leave to amend, which, like the trial court in the case at bench, found, as a matter of law, the insured's allegations that the physical presence of the virus on insured property constituted direct physical loss or damage were insufficient to trigger coverage. (*Id.* at p. 838.)[13] Rejecting the analogy to the infiltration of asbestos considered in *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co., supra*, 45 Cal.App.4th 1 and the presence of environmental contaminants found sufficient for coverage in *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, like *Armstrong* a case involving a CGL policy, the court reasoned, "[T]he virus exists worldwide wherever infected people are present, it can be cleaned from surfaces through general disinfection measures, and transmission may be reduced or rendered less harmful through practices unrelated to the property, such as social distancing, vaccination, and the use of masks. Thus, the presence of the virus does not render a property useless or uninhabitable, even though it may affect how

---

[13]     *United Talent*, agreeing with the analysis in *Inns-by-the-Sea*, also held temporary loss of use of a property due to pandemic-related closure orders, without more, did not constitute direct physical loss or damage and was insufficient for a claim of coverage under commercial property insurance policies. (*United Talent, supra*, 77 Cal.App.5th at pp. 830-832.) The insureds in this case made no such claim.

people interact with and within a particular space." (*United Talent*, at p. 838.)[14]

Thus, the *United Talent* court, based on its de novo review, affirmed a trial court ruling that, like the decision we review, found—without evidence—the COVID-19 virus does not damage property. But the insureds here expressly alleged that it can and that it did, including the specific allegation they were required to dispose of property damaged by COVID-19. We are not authorized to disregard those allegations when evaluating a demurrer, as the court did in *United Talent*, based on a general belief that surface cleaning may be the only remediation necessary to restore contaminated property to its original, safe-for-use condition. That was not always the understanding of the appropriate precautions to take with items potentially exposed to the virus (many people, in the early months of the pandemic, left groceries and other items outside their homes for several days after first sanitizing them); the insureds expressly alleged disinfecting affected objects does not repair or remediate the actual physical alteration to property caused by the virus; and the trial court did not take judicial notice of the effectiveness of cleaning as a proposition "not reasonably subject to dispute" pursuant to Evidence Code section 452, subdivisions (g) or (h).

Even if there had been evidence subject to proper judicial notice to establish that disinfecting repaired any alleged property damage, it would not resolve whether contaminated property had been damaged in the interim, nor would it alleviate any loss of business income or extra expenses. As the insureds argue on

---

[14]    The court added, "UTA has not alleged that its properties required unique abatement efforts to eradicate the virus." (*United Talent*, *supra*, 77 Cal.App.5th at p. 839.)

23

appeal, the duration of exposure may be relevant to the measure of policy benefits; it does not negate coverage.

Finally, Fireman's Fund's argument and the trial court's conclusion that the COVID-19 virus cannot cause direct physical loss or damage to property are directly undermined by the policy's plain language establishing communicable disease coverage. Fireman's Fund asserts the insureds must allege an obvious physical alteration, for example, "broken chairs, dented walls, or smashed windows," to adequately allege direct physical loss or damage. Because it is undisputed the COVID-19 virus (or presumably any communicable disease) does not cause such damage, Fireman's Fund argues, it cannot cause property damage as defined in the policy. However, as discussed, the communicable disease coverage states Fireman's Fund will pay for "direct physical loss or damage" to insured property "caused by or resulting from a covered **communicable disease event**," including necessary costs to "[r]epair or rebuild [insured property] which has been damaged or destroyed by the communicable disease." This language explicitly contemplates that a communicable disease, such as a virus, can cause damage or destruction to property and that such damage constitutes direct physical loss or damage as defined in the policy. Construing the policy provisions together, as we must, this language precludes the interpretation that direct physical loss or damage categorically cannot be caused by a virus. (See Civ. Code, § 1641 ["[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].)

5. *The Mortality and Disease Exclusion*

If, as the trial court ruled and Fireman's Fund argues on appeal, the policy's mortality and disease exclusion bars all loss or damage caused by a virus, then it would be immaterial whether the first amended complaint alleged facts showing direct physical loss or damage to property from the COVID-19 virus. The most reasonable interpretation of that policy language, however, does not exclude the insureds' claim of loss.

Significantly, in the wake of the SARS outbreak (caused by the SARS-CoV virus) in the early 2000's, the Insurance Services Office (ISO) in 2006 introduced a new industry-standard endorsement for commercial property policies, "CP-01-40-07-06— Exclusion Of Loss Due To Virus Or Bacteria," which stated there is no coverage for losses or damage caused by, or resulting from, any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease. (ISO Circular, New Endorsements Filed To Address Exclusion of Loss Due to Virus or Bacteria (July 6, 2006) <https://www.propertyinsurancecoveragelaw.com/wp-includes/ms-files.php?file=2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf> [as of July 13, 2022], archived at https://perma.cc/NXM6-36HM.) That exclusion was included, for example, in the policy at issue in *Musso & Frank*, *supra*, 77 Cal.App.5th 753. Accordingly, Division One of this district held, in rejecting the insured's claim for losses incurred as a result of its pandemic-related business closure, "even assuming Musso & Frank could bring itself within the insuring clause, the virus exclusion would bar coverage." (*Id.* at p. 761; accord, *Mudpie*, *supra*, 15 F.4th at p. 893 [the policy's virus exclusion, which provided, "[Travelers] will not pay for loss or damage

caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease," bars coverage for Mudpie's claimed COVID-19-related losses].)

The policy issued to the insureds did not contain this virus or bacteria exclusion. Instead, as discussed, the exclusion provided only that the insurer would not pay for loss, damage or expense caused by, or resulting from, "[m]ortality, death by natural causes, disease, sickness, any condition of health, bacteria, or virus." Particularly when compared to the all-encompassing language of the ISO virus exclusion, the most reasonable interpretation of this language is that it precludes coverage for losses related to death from any of the listed causes—that is, it excludes losses resulting from a death caused by a virus or other disease, and not more broadly any otherwise covered losses resulting from a virus or a disease. At the very least, the language is ambiguous. Absent extrinsic evidence of the parties' expectations—hardly surprising given the preliminary stage of the proceedings—the exclusion must be interpreted narrowly, at least for now. (See *Montrose Chemical Corp. of California v. Superior Court*, *supra*, 9 Cal.5th at p. 230; see also *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 ["'[a]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear'"].)

This understanding of the exclusion's more limited reach is reinforced by the policy's communicable disease coverage, which applies if there is a direct physical loss or damage to insured property caused by a public health authority order that a location be evacuated, decontaminated or disinfected due to the outbreak of a transmissible virus. If all losses caused by a virus were

excluded, even those indirectly resulting from the virus, as Fireman's Fund contends, the communicable disease coverage would be meaningless.  It is our obligation to interpret the policy in a manner that does not leave one of its provisions without effect.  (See Civ. Code, § 1641 ["[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"]; *AIU Ins. Co. v. Superior Court*, *supra*, 51 Cal.3d at pp. 827-828 [insurance policy should not be read in such a way as to render some of its terms meaningless]*; Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 818 [same].)  We do so by holding the mortality and disease exclusion does not bar the insured's claims in this lawsuit.

      6.  *Conclusion*

      Quoting from one of the many out-of-state federal court decisions cited in its respondent's brief, Fireman's Fund argues, "'Common sense' confirms that 'the pandemic impacts human health and human behavior, not physical structures,'" and asserts "common experience from all of us being in homes, courtrooms, or other structures during the pandemic shows that COVID-19 does not physically alter the structure of property."  We acknowledge it might be more efficient if trial courts could dismiss lawsuits at the pleading stage based on the judges' common sense and understanding of common experience rather than waiting to actually receive evidence to determine whether the plaintiff's factual allegations can be proved.  But that is not how the civil justice system works in this state.

      Because the insureds adequately alleged losses covered by Fireman's Fund's policy, they are entitled to an opportunity to present their case, at trial or in opposition to a motion for

summary judgment.  The judgment of dismissal based on the trial court's disbelief of those allegations, whether ultimately reasonable or not, must be reversed.

### DISPOSITION

The judgment is reversed, and the cause remanded with directions to the trial court to vacate its order sustaining the demurrer without leave to amend and to enter a new order overruling the demurrer.  The insureds are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.